RENDERED: SEPTEMBER 18, 2025
TO BE PUBLISHED

# Supreme Court of Kentucky

### 2023-SC-0544-MR

JASON BALDWIN          APPELLANT

V.        ON APPEAL FROM MADISON CIRCUIT COURT
HONORABLE COLE ADAMS MAIER, JUDGE
NO. 19-CR-00066

COMMONWEALTH OF KENTUCKY          APPELLEE

**OPINION OF THE COURT BY CHIEF JUSTICE LAMBERT**

**<u>AFFIRMING</u>**

Jason Baldwin was convicted of one count each of first-degree rape; first-degree sodomy; distribution of obscene material to a minor; use of a minor in a sexual performance; and first-degree sexual abuse. He was also convicted of sixty-eight counts of possession of matter portraying a sexual performance by a minor. He now appeals his convictions and resulting sentence of life imprisonment as a matter of right.[1]

In addition to several other issues raised by Baldwin, this appeal requires this Court to address as a matter of first impression whether raw, machine extracted data constitutes testimonial hearsay that would implicate a

---

[1] Ky. Const. § 110(2)(b).

criminal defendant's Confrontation Clause rights. After thorough review, we hold that it does not and affirm the Madison Circuit Court in full.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In January 2019 Baldwin lived in a subdivision in Richmond, Kentucky with his girlfriend, Tina, and Tina's nine-year-old grandson John.[2] Nicole and David lived in the home immediately next to Baldwin with their two children, four-year-old Jane and eight-year-old Adam. David and Baldwin met "just being neighborly," and the two families began to socialize, including having cookouts and celebrating holidays together. As John and Adam were close in age, they often played together. Baldwin and Tina both worked the night shift, and when they were both working the same night, David and Nicole would babysit John. Baldwin and Tina sometimes returned the favor by babysitting Jane and Adam.

January 6, 2019, was the first time Baldwin babysat Jane and Adam by himself without Tina. David and Nicole were attending a retirement party for a work colleague and dropped Jane and Adam at Baldwin's home sometime in the early evening. The only people present in the home were Baldwin and the three children. At some point, while John and Adam were watching a movie in the living room, one of Baldwin's dogs inflicted a minor scratch on Jane's leg. Baldwin took her into his bedroom under the guise of getting her a Band-Aid.

---

[2] We will use pseudonyms to identify each of the children discussed in this case in order to protect their privacy. In a further effort to protect the identity of the children, the adults involved in this case, apart from Baldwin, will be identified by only their first names.

2

Jane, who was eight years old when she testified at Baldwin's trial, said that she remembered laying on Baldwin's bed on her back and that he directed her take off her pants and underwear. He then showed her a picture on his phone of "someone licking someone's private parts." After he showed her the image, he "touched and licked [her] private part." When the Commonwealth asked Jane to be more specific about what she meant by her "private part" she said it was the "front part" that "lets [her] use the bathroom" to go "number one." Jane further said she thought Baldwin's fingers touched her on the "inside." She told Baldwin she did not like it and he stopped. John, who was thirteen years old during trial, partially corroborated Jane's testimony. He said that he and Adam were watching a movie that night when one of the dogs scratched Jane, and he remembered Baldwin taking Jane into his bedroom to get a Band-Aid which took about ten minutes.

After David and Nicole picked their children up from Baldwin's home on January 6, Nicole gave Jane a bath to get her ready for bed. During her bath Jane told Nicole what Baldwin did to her. David and Nicole immediately called 911 and two patrol officers from the Richmond Police Department (RPD), Officers Creech and Coleman, responded to their home. After speaking with David and Nicole, the officers contacted Detective Jason Friend.[3] When Det. Friend arrived on scene he also spoke with Jane's parents then immediately thereafter went to Baldwin's home next door with Ofc. Creech. Baldwin

---

[3] Det. Friend was a patrol officer at the time of Baldwin's trial, but we will refer to him by the title he held at the time of his investigation.

consented to the officers' entry, and Ofc. Friend read him his *Miranda*[4] warnings before speaking to him. Ofc. Friend informed Baldwin of the nature of Jane's allegations and asked him to come with them to the police station to be interviewed. Baldwin invoked his right to counsel and declined. Because Jane had alleged Baldwin used his cellphone during the sexual abuse, the officers seized Baldwin's phone and left.

On January 15, 2019, Det. Friend attended a forensic interview of Jane at a Children's Advocacy Center (CAC). After the interview, Det. Friend obtained an arrest warrant for Baldwin for the charges of first-degree rape and first-degree sodomy. He was further charged with distributing obscene material to a minor when he was indicted by a grand jury on January 23, 2019.

Det. Friend obtained a search warrant for Baldwin's cellphone on January 8, 2019, and examined its external memory card. On it, he found a video of Tina performing oral sex on Baldwin that he believed could have been the image that Baldwin showed Jane on his phone during the January 6 incident. Det. Friend also found several files that had been deleted. Det. Friend did not know what those files contained, but they had titles such as: "LS magazine," "LS models," "LS dreams," "David Hamilton," "Lolita's kingdom," and "Lolita's sex party." He testified that the files containing the term "LS" were significant to him because LS Studios was a now defunct Ukrainian

---

[4] *Miranda v. Arizona*, 384 U.S. 436 (1966).

company that produced and provided a subscription service for child pornography between 2001 and 2004. David Hamilton was similarly significant because he was a well-known child pornography producer in the 1980s. Despite the depth of his knowledge in this area, Det. Friend was unaware of the connection the term "Lolita" has with pedophilia. *See* VLADIMIR NABOKOV, LOLITA (1955).

Although the memory card contained no child pornography, the deleted folder titles made Det. Friend strongly suspect that the phone itself would. He therefore obtained a data extraction from it. As the Confrontation Clause implications of that data extraction are the primary issue in this case, we reserve discussion of that process for Section II(B) of this Opinion below. The data extraction demonstrated that there were several innocuous items on Baldwin's cellphone that connected him to that data: his social media accounts; pictures of himself, his family, his home, his truck; Tina's contact information, etc. It also contained sixty-eight images of child pornography that had creation dates[5] between October 7, 2018, and January 6, 2019. The final image was placed on Baldwin's phone approximately one hour before Det. Friend seized it. As it is not relevant to the issues raised by this appeal, we will spare the reader the horrendous details of those photographs but note that

---

[5] By "creation date," we do not mean the date an image was originally created. Rather, it is the date that the meta data on Baldwin's phone indicated that an image came to be on it.

they included nude images of unidentified prepubescent boys and girls, as well as unidentified female infants.

In addition to the images of unknown children, there were images of John nude from the waist down. Because of those photographs, Det. Friend also had John forensically interviewed at a CAC. Following that interview, superseding indictments were obtained against Baldwin for first-degree sexual abuse, use of a minor in a sexual performance, and sixty-nine[6] counts of possession of matter portraying a minor in a sexual performance.

At trial, John testified that he began living with Baldwin and Tina when he was seven years old. The first time Baldwin sexually abused him he was alone in the home with Baldwin because Tina was at work. John asked Baldwin if he could play a violent video game that Tina would not allow him to play. Baldwin told him he would let him play the game if he did something for Baldwin. Baldwin then took John into his bedroom, took his pants off, and touched his genitals. John was unsure how many times Baldwin touched his genitals over the ensuing two years, but he knew it occurred more than ten times. Baldwin would abuse him in both Baldwin's bedroom and the living room and would touch John's penis with both his hands and his mouth. John further testified that Baldwin would take pictures of him with his clothes off, and that the sexual abuse stopped after Jane disclosed on January 6, 2019.

---

[6] The Commonwealth later dismissed one of the counts of possession of matter portraying a minor in a sexual performance due to an error in the description of the image on the indictment.

6

John did not tell anyone about the abuse until his CAC interview because Baldwin told him he would hurt Tina if he did. At that time, John was living with Tina because both of his parents had substance use disorder and were unable to care for him.

Baldwin testified in his own defense and denied his guilt. He claimed that he was unaware that any of the images of child pornography were on his phone and made several suggestions as to how the images came to be on it. He first insinuated that a malware program on the internet had placed the images on his phone. He also implied that someone may have taken a memory card out of one of his trail cameras, placed child pornography on it, put in back in the trail camera, and he thereafter inadvertently put the memory card into his phone. Finally, he suggested that the manner in which his phone was handled by law enforcement after it was seized allowed some unknown malicious entity to place child pornography on it. Though we again note, as did the Commonwealth, that no new child pornography was placed on the phone after the date it was seized. He further alleged that both Jane and John's allegations were untrue and highlighted the fact that, due to a lack of physical evidence, it was "their word against his."

The jury found Baldwin guilty of first-degree sodomy, first-degree rape, and distribution of obscene material to a minor for his offenses against Jane on January 6, 2019. It further found him guilty of use of a minor in a sexual performance and first-degree sexual abuse, continuing course of conduct, for his offenses against John. Finally, it found him guilty of sixty-eight counts of

7

possession of matter portraying a sexual performance by a minor, including one count for the image of John naked from the waist down.

Additional facts are discussed below as necessary.

## II. ANALYSIS

### A. Warrantless Seizure of Baldwin's Cellphone

Baldwin filed a pre-trial motion to suppress all the evidence obtained from his cellphone on the basis that it had been seized in violation of the Fourth Amendment. U.S. Const. amend. IV.; U.S. Const. amend. XIV; Ky. Const. § 10. The motion, which cited no case law, asserted that the officers lacked probable cause to seize his phone and highlighted that Det. Friend did not seek a search warrant until two days after the seizure. The Commonwealth did not file a response.

During the suppression hearing that followed, Det. Friend was the sole witness. He testified that because Jane had alleged that Baldwin used his cellphone during the January 6 incident, he believed the phone contained evidence of a crime. On the same night the incident occurred, and immediately after speaking to Jane's parents, Det. Friend and Ofc. Creech went next door to Baldwin's house. Ofc. Creech was wearing a body camera during the interaction and that footage was played during the suppression hearing.

The body camera footage showed Baldwin answering his front door at around 11:50 p.m. The officers asked him if they could come in and ask him some questions about a case they were investigating; Baldwin consented to their entry. The front door opened into the living room and the officers initially

8

spoke to Baldwin while he was sitting on a couch. They asked him if anyone else was in the home and he told them that John was home but asleep. The officers then told him they wanted to ask him some questions and read him his *Miranda* warnings. Baldwin initially agreed to talk to them and asked what was going on. Det. Friend informed him that Jane had alleged that Baldwin had touched her privates. The detective then asked him if he had a cellphone and he acknowledged that he did. Det. Friend told him that Jane had also alleged he had used his cellphone during the abuse. At that point, Baldwin stood up from the couch and went around the corner into the kitchen and picked up his phone; both officers followed.

Baldwin picked up his phone and said, "I don't know what I would have been viewing," and asked, "Do I need to call [John's] grandma to come get him or something?" Det. Friend said he would like for him to do that because he wanted Baldwin to go to the police station with them to be interviewed. Baldwin responded, "Alright, well at this time I think I want a lawyer." Det. Friend told him that they would be seizing his cellphone, and Baldwin responded he did not consent to that. Baldwin then started doing something on the phone and said, "Let me make a few phone calls." Det. Friend told him they had to monitor him, and Baldwin said that was fine.

Baldwin grabbed a cigarette and walked out of the kitchen into the living room with his phone still in hand. When he got to the living room, he turned around to get a lighter and realized that Ofc. Creech was directly behind him. Baldwin became agitated, threw his hands up, and said, "You guys can pat me

9

down but please give me a little bit of space so you're not my shadow."  Det. Friend responded that they were going to go ahead and take his cellphone. Baldwin still had his arms raised with his phone in his left hand.  Ofc. Creech held Baldwin's left wrist and Det. Friend took the phone out of his hand. Baldwin did not struggle against them or try to keep them from taking it.  Det. Friend explained that Baldwin told them to give him space and they were not going to allow that while he still had the phone.  As Baldwin had invoked his right to counsel, and because they had accomplished the seizure of the phone, the officers left the premises.  Det. Friend filed an application for a search warrant for the phone on January 8, 2019, at 11:37 a.m., approximately thirty-six hours after it was seized.

During the suppression hearing, the Commonwealth argued that, based on Jane's allegations, the officers had a reasonable belief that Baldwin's phone would contain evidence of a crime.  It primarily relied upon *United States v. Williams*, in which the Sixth Circuit noted that "[i]f 'law enforcement authorities have probable cause to believe that a container holds. . . evidence of a crime' and the exigencies of the circumstances demand it,' seizure of the container 'pending issuance of a warrant to examine the contents' is permitted."  998 F.3d 716 (6th Cir. 2021) (quoting *United States v. Place*, 462 U.S. 696, 701 (1983) (collecting cases)).  The Commonwealth asserted that the exigencies of the circumstances demanded seizure of the phone because Baldwin's behavior gave the officers reason to believe he would attempt to delete evidence off of it if it was not seized immediately.

10

Defense counsel responded that there was no reason one of the officers could not have stayed at the scene with Baldwin and the phone while the other officer left to obtain a warrant to seize it. Counsel further argued that the thirty-six-hour delay between seizure of the phone and seeking the search warrant rendered the warrantless seizure unreasonable. It is notable for our purposes that while defense counsel asserted that no exigent circumstances existed, he never argued that any exigent circumstances that may have existed were trumped by the "police-created exigency" doctrine. *See Kentucky v. King*, 563 U.S. 452, 469 (2011) (holding "the exigent circumstances rule applies when the police do not gain entry to premises by means of an actual or threatened violation of the Fourth Amendment."); *Turley v. Commonwealth*, 399 S.W.3d 412, 424 (Ky. 2013) (citing *King*, 563 U.S. at 462) ("[A] police-created exigency justifies a warrantless search only so long as the police conduct leading up to that exigency was lawful under the Fourth Amendment.").

The trial court took the matter under advisement and thereafter issued a written order. The court identified the two issues before it as being whether the initial seizure of the phone was lawful and, if so, whether the post-seizure delay in seeking and executing the search warrant was reasonable. As to the first issue, relying on *Place*, the trial court found that the initial seizure of the phone was lawful because "[a]t the time the phone was seized, probable cause[7]

---

[7] Out of an abundance of caution, we note that while the *Place* Court did state that when an officer has

> probable cause to believe that a container holds contraband or evidence of a crime, but have not secured a warrant, the Court has interpreted the

existed to believe that the phone might contain evidence that would corroborate [Jane's] account of the alleged offense and/or possess evidence of a crime." And, citing *United States v. Mitchell*, 565 F.3d 1347 (11th Cir. 2009), the trial court concluded that "[t]he temporary seizure of the phone, while the investigating officer obtained a search warrant, did not meaningfully interfere with [Baldwin's] possessory interests."[8]  The trial court further concluded that exigent circumstances existed as it found that

> digital information contained on a phone can be deleted, altered, or otherwise made unavailable with relative ease, and. . . [i]n light of those considerations, the RPD officers temporarily seized Mr. Baldwin's phone to secure it for examination later and to avoid the destruction of evidence. . . The temporary seizure of the phone was. . . reasonably based on concerns regarding potential destruction of evidence of criminal wrongdoing on the device.

The trial court next addressed whether the thirty-six-hour delay in seeking a search warrant rendered the initial lawful seizure unreasonable. Citing *United States v. Burgard*, 675 F.3d 1029, 1033-34 (7th Cir. 2012)

---

[Fourth] Amendment to permit seizure of the property, pending issuance of a warrant to examine its contents, if the exigencies of the circumstances demand it[,]

the issue actually addressed by the United States Supreme Court in *Place* was whether such a seizure could occur "on the basis of *less than* probable cause[.]"  462 U.S. at 701-02 (emphasis added).  Specifically, whether a seizure could be permitted based only on the "reasonable, articulable suspicion, premised on objective facts" standard established by *Terry v. Ohio*, 392 U.S. 1 (1968).  462 U.S. at 702.

[8] The *Mitchell* Court held that a twenty-one-day delay between the warrantless seizure of a hard drive and the filing of an application for a search warrant was unreasonable based on the circumstances of the case.  *Id.* at 1351-53.  Nevertheless, it initially held that a seizure "to ensure that the hard drive was not tampered with before a warrant was obtained. . . would not have violated the Warrant Clause."  *Id.* at 1350.  In other words, *Mitchell* held that the initial seizure of the hard drive was lawful, but the delay in seeking a search warrant to search it violated the defendant's Fourth Amendment rights.

(collecting cases), the trial court conceded that no bright line test exists to determine when a delay becomes unreasonable and that courts are instead directed to weigh factors "including the infringement on the person's possessory interest, brevity of the seizure, the state's basis for seizing the item, whether the seizure was supported by reasonable suspicion or probable cause, and the diligence with which law enforcement acted."

In weighing those factors, the trial court concluded that while individuals clearly have a meaningful possessory interest in their cellphones, the Commonwealth has a substantial interest in prosecuting sexual offenses perpetrated against children. It further found that the initial seizure was supported by probable cause based on Jane's allegations, and that the delay between seizure of the phone and seeking the warrant was less than two full days. It found that "the brief delay in seeking the initial search warrant was not unreasonable" and denied Baldwin's motion to suppress.

The only argument Baldwin presents to this Court is that the exigent circumstances exception to the warrant requirement did not justify the seizure of his cellphone because the officers created the exigent circumstances themselves. Baldwin relies solely on *Hall v. Commonwealth*, 438 S.W.3d 387 (Ky. App. 2014) (applying *King* and holding that the police-created exigency doctrine applied because the officers entered an apartment in a manner that violated the Fourth Amendment). This argument was never asserted before the

13

trial court and is therefore unpreserved. *See* RCr[9] 9.22. Baldwin has not

requested review for palpable error under RCr 10.26, and we decline to address

it.

## B. The Cellebrite Data Extraction

Baldwin's next assertions of error concern the admission of the images of

child pornography that were found on his cellphone. He contends that the

admission of these photographs violated his Confrontation Clause rights

because he was unable to cross-examine the Cellebrite forensic analyst that

extracted data that led the officers to the discovery of the images on his

cellphone. He further argues that they were not properly authenticated.

Cellebrite is a for profit, digital forensics company that specializes in the

creation and manufacturing of programs that can perform forensic extractions

on digital devices. Members of law enforcement are not privy to how

Cellebrite's proprietary technology works, but they can be trained to use it.

Cellebrite's extraction equipment allows law enforcement to perform an

extraction of all the data that exists on a device. In essence it creates a "clone"

of all the information on a particular device and uploads it to a computer; all

an officer must do is plug the device into the forensic equipment and run the

program. However, the data that is thereby extracted is not in a form that is

capable of being read or understood by the average person. Officers must use

a different Cellebrite program called Physical Analyzer to "translate" all the raw

---

[9] Kentucky Rule of Criminal Procedure.

14

data extracted from the phone into an intelligible format. One of the officers who testified in this case, Kentucky State Police Trooper[10] Aaron Gabhart, stated that unless an individual had an "extreme knowledge of computers and programing" they would be unable to look at the raw data from an extraction and know what it contained before translating it with the second Cellebrite program, Physical Analyzer.

Det. Friend testified that he seized Baldwin's cellphone on January 6, 2019. He explained that under normal circumstances both the data extraction and the Physical Analyzer translation would have been conducted at RPD's station. But because Baldwin's phone was "locked" by a passcode, Det. Friend was unable to perform the usual, in-house data extraction. He contacted Tpr. Gabhart, who was at that time a member of an electronic crimes task force assigned to the United States Secret Service (USSS), for assistance. Det. Friend hand delivered the phone to Tpr. Gabhart at the USSS' Louisville, Kentucky, field office on February 8, 2019. Tpr. Gabhart was likewise unable to use Cellebrite's extraction program due to the phone's passcode. Because of this roadblock, Tpr. Gabhart packaged and mailed the phone to the USSS' Cleveland, Ohio, field office on the same day he received the phone: February 8, 2019. The Cleveland field office received the phone on February 12, 2019, but the agents there were also unable to extract the phone's data because of its

---

[10] At the time of Baldwin's trial, Trooper Gabhart was a United States Secret Service Agent. We will refer to him using the title he held at the time of the investigation at issue.

15

passcode. They therefore sent the phone to Cellebrite's American headquarters in Parsippany, New Jersey, on May 31, 2019.

On June 6, 2019, Cellebrite's Forensic Lab Administrator, Joseph Raspante, received the phone and delivered it to the forensic specialist who was assigned to perform the extraction. That forensic specialist successfully completed a data extraction from the phone on August 12, 2019, and placed it on an encrypted thumb drive. The cellphone and the encrypted thumb drive were shipped back to the Cleveland field office on September 27, 2019. The Cellebrite analyst performed no other work in the investigation. The analyst did not, for example, run the raw data through Physical Analyzer or opine on whether that data contained child pornography. The analyst simply made a copy of the phone's data and mailed it back.

On September 30, 2019, Mr. Raspante signed a "Certification and Business Record of Cellebrite, Inc." (Certification). The Certification attested to: Mr. Raspante's familiarity with Cellebrite's protocols for the intake, processing, and return of mobile devices; the date and manner in which Baldwin's phone was received; the date the phone was provided to a Cellebrite forensic specialist and that the specialist was able to extract data from it; the analyst's actions in making a copy of the data extraction and placing it on an encrypted drive; and the manner in which the phone was returned to the requesting entity. It further stated that the contents of the data extraction were not examined by anyone at Cellebrite, that the device did not leave the custody of Cellebrite at any time, and that the Certification itself and the information it referenced were

16

business records kept by Cellebrite in the course of a regularly conducted activity.

The Cleveland field office received the phone and the thumb drive containing the data extraction on September 30, 2019, and shipped those items to Tpr. Gabhart in Louisville on October 4, 2019. The Cleveland field office did not perform any investigation, it simply forwarded the package. Tpr. Gabhart received that package on October 9, 2019. He took the raw data on the encrypted thumb drive and ran it through Physical Analyzer, which produced a "report" of the translated data. Det. Friend had previously informed Tpr. Gabhart that Baldwin's phone might contain child exploitation material. Tpr. Gabhart therefore conducted a limited review of the translated data to determine if such materials were present, as that would heighten the protocols for handling the evidence. Based on his limited review, he concluded child pornography was present. He immediately informed Det. Friend and returned the evidence to him. On October 22, 2019, Det. Friend received the phone, the thumb drive containing the raw data, and the Physical Analyzer report containing the translated data. The translated data revealed the dozens of images of child pornography for which Baldwin was later indicted.

At trial, Baldwin's physical cellphone and the sixty-eight images of child pornography found on it via the data extraction were admitted into evidence. The raw data extracted from the phone, the Physical Analyzer report, and the Certification signed by Mr. Raspante were not admitted. Both Det. Friend and Tpr. Gabhart testified and were subjected to cross-examination by Baldwin.

17

The Commonwealth did not call the Cellebrite analyst that extracted the raw data to testify.

Before the trial court, Baldwin objected to the photographs being admitted based on a lack of proper authentication. He further asserted that the Confrontation Clause required the Commonwealth to make the Cellebrite forensic specialist who extracted the raw data available for cross-examination.[11] The trial court ruled that the Commonwealth had sufficiently authenticated the photographs, and that the Confrontation Clause did not require the Commonwealth to make the Cellebrite analyst available for cross-examination. The court noted that, while there was no Kentucky authority on the issue, the Fifth Circuit has held that that raw, machine produced cellphone data extractions "contain[] 'only machine-generated results,' and [are] thus non-testimonial." *United States v. Hill*, 63 F.4th 335, 359 (5th Cir. 2023). The trial court agreed with the Fifth Circuit and found that the data extraction in this case was not testimonial and that the Confrontation Clause was not implicated. *See, e.g.*, *Peacher v. Commonwealth*, 391 S.W.3d 821, 834 (Ky. 2013) ("[T]he Confrontation Clause of the Sixth Amendment precludes the use against a criminal defendant of testimonial hearsay statements unless the

---

[11] Baldwin also raised a chain of custody argument before the trial court but abandoned it after the trial court found that the Commonwealth was not required to establish a perfect chain of custody so long as it demonstrated there was a reasonable probability that the evidence had not been altered in any material respect, and that it had satisfied that burden. *See, e.g.*, *Helphenstine v. Commonwealth*, 423 S.W.3d 708, 717 (Ky. 2014). Baldwin has not renewed his chain of custody argument to this Court.

18

statement's maker, the declarant, testifies at trial or otherwise has been available for cross-examination by the defendant.").

Before this Court Baldwin renews his argument that the admission of the photographs violated his Confrontation Clause rights because the data extraction from which they were obtained was testimonial hearsay and he was not afforded the opportunity to cross-examine the analyst who performed the extraction. He additionally asserts that the Commonwealth failed to properly authenticate any of the photographs.[12] We address each argument in turn.

## 1) *Baldwin's Confrontation Clause rights were not violated.*

The Confrontation Clause of the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right. . .to be confronted with the witnesses against him[.]" U.S. Const. amend. VI; U.S. Const. amend. XIV. *See also* Ky. Const. § 11 ("In all criminal prosecutions the accused has the right to. . . meet the witnesses face to face[.]"). Baldwin's assertion that his right to confrontation was violated was properly preserved for our review by his arguments below and we will review for harmless error. *Staples v. Commonwealth*, 454 S.W.3d 803, 826 (Ky. 2014). "Harmless error analysis applied to a constitutional error, such as [a] Confrontation Clause violation. . . involves considering the improper evidence in the context of the entire trial and asking whether there is a reasonable possibility that the

---

[12] Baldwin also argues that the data extraction did not qualify for admission under the business records exception to hearsay. *See* KRE 803(6). Our holding below that the data extraction was not hearsay eliminates the need to address that argument.

19

evidence complained of might have contributed to the conviction." *Id.* at 826-27 (internal quotation marks omitted).

We begin, as we must, with the United States Supreme Court's Confrontation Clause jurisprudence as delineated in *Crawford v. Washington,* 541 U.S. 36 (2004); *Davis v. Washington,* 547 U.S. 813 822 (2006); *Melendez-Diaz v. Massachusetts,* 557 U.S. 305 (2009); *Bullcoming v. New Mexico,* 564 U.S. 647 (2011); and *Smith v. Arizona,* 602 U.S. 779 (2024).

Prior to *Crawford,* the Supreme Court utilized an amorphous "indicia of reliability" test to determine when an unavailable witness' testimonial hearsay statement was admissible. *See Ohio v. Roberts,* 448 U.S. 56, 66 (1980), *abrogated by Crawford,* 541 U.S. at 68-69.[13]  In *Crawford,* the Supreme Court abandoned that test and endeavored to establish an interpretation of the Confrontation Clause that more closely aligned with the Framer's intentions.  It opined that "the principal evil at which the Confrontation Clause was directed was the. . . use of *ex parte* examinations as evidence against the accused." *Id.* at 50.  Thus, it held, the Confrontation Clause "applies to 'witnesses' against the accused—in other words, those who 'bear testimony[,]'" and defined "testimony' as "'[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.'" *Id.* at 51.

---

[13] *Roberts* held that "when a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable.  Even then, his statement is admissible only if it bears adequate 'indicia of reliability.'"  448 U.S. at 66.

Although the *Crawford* Court saved for another day any attempt to provide a comprehensive definition of "testimonial," it held that when testimonial hearsay evidence is at issue "the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." *Id.* at 68. Stated differently, to admit a non-testifying witness' testimonial hearsay statement into evidence, that witness must be unavailable, and the defendant must have had a prior opportunity to cross-examine that witness. Two years later, in *Davis*, the Court provided additional, albeit non-exhaustive, guidance on when a statement is "testimonial" within the context of a police interrogation. 547 U.S. at 822. It held that a statement is nontestimonial "when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency[,]" and a statement is testimonial "when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Id.*

The hearsay statements at issue in *Crawford* and *Davis* did not concern forensic evidence.[14] But in *Melendez-Diaz*, the Supreme Court squarely

---

[14] In *Crawford*, the defendant's wife gave a recorded statement to police and thereafter declined to testify at trial pursuant to Washington's marital privilege statute. 541 U.S. at 39-40.

*Davis* concerned separate appeals from two cases. 547 U.S. at 817-21. In the first, the prosecution played a recording of a 911 call that the victim made during a domestic violence incident involving the defendant because the victim refused to testify at trial. *Id.* at 817-19. In the second, the prosecution entered a victim's affidavit

21

rejected an attempt to formulate a forensic evidence exception to *Crawford.* 557 U.S. at 313-21. During the trial in *Melendez-Diaz,* the prosecution entered three "certificates of analysis" that showed the results of the forensic testing conducted on a substance seized at the time of the defendant's arrest. *Id.* at 308. The certificates stated that "[t]he substance was found to contain: Cocaine[]" and each were sworn before a notary public as mandated by state law. *Id.* The certificates were admitted at trial "pursuant to state law as 'prima facie evidence of the composition, quality and the net weight of the narcotic. . . analyzed.'" *Id.* at 309. The defendant objected to the admission of the certificates under the Confrontation Clause because the analysts that conducted the testing were not called as witnesses by the prosecution. *Id.*

The Supreme Court held that the admission of the certificates violated the defendant's right to confrontation. *Id.* at 309-11. It noted that the certificates were plainly affidavits, which were mentioned twice in *Crawford* as belonging to the "core class of testimonial statements[,]" and held that they were "incontrovertibly a solemn declaration or affirmation made for the purpose of establishing or proving" that the substance seized by police was cocaine. *Id.* at 310. The Court further discussed that the evidence was "the precise testimony the analysts would be expected to provide if called at trial[,]" and that the certificates were therefore "functionally identical to live, in-court

describing a domestic violence incident involving the defendant when she refused to testify at trial. *Id.* at 819-21.

22

testimony, doing precisely 'what a witness does on direct examination.'" *Id.* at 310-11 (quoting *Davis*, 547 U.S. at 830).

Moreover, the affidavits were clearly "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial," as state law provided that their sole purpose was to establish prima facie evidence of the composition, quality, and weight of an analyzed substance. *Id.* at 311. The Court held that the defendant was entitled to confront those analysts at trial absent a showing that the analysts were unavailable to testify and that the defendant had a prior opportunity to cross-examine them. *Id.*

*Bullcoming* and *Smith* both involved the application of *Melendez-Diaz* to slightly varying facts. In *Bullcoming*, law enforcement executed a search warrant to obtain a sample of the defendant's blood following a vehicular collision. 564 U.S. at 652. That sample was then tested via gas chromatograph at a state lab and the results of that testing were memorialized in a report that was completed and signed by the forensic analyst who conducted it. *Id.* at 652-53. The report stated, *inter alia*, that the defendant's BAC[15] was .21, that the seal of the sample was received intact and was broken in the laboratory, and that the analyst had followed the established procedures for testing the sample. *Id.* at 653. By the first day of trial the analyst who conducted the testing and made the report had been placed on unpaid leave.

---

[15] Blood Alcohol Content.

*Id.* at 655. In lieu of calling that analyst to testify, the prosecution was permitted to admit the report through the testimony of a different analyst from the same lab that neither observed nor reviewed the initial analyst's testing. *Id.* at 655-56.

The *Bullcoming* Court rejected the New Mexico Supreme Court's holding that the initial analyst "simply transcribed the result generated by the gas chromatograph" and that the defendant's "true 'accuser'" was the machine. *Id.* at 659. The Court reasoned that "[the analyst's] certification. . . *reported more than a machine-generated number*[,]" as it stated that the analyst received the sample intact, that he adhered to a particular protocol, and that nothing affected the integrity of the sample or the validity of the analysis. *Id.* at 659-60 (emphasis added). The Court concluded that those "representations, relating to past events and human actions *not revealed in raw, machine-produced data* are meet for cross-examination." *Id.* at 660 (emphasis added). The Court further rejected the state's argument that the report was nontestimonial, as "*Melendez-Diaz* left no room for that argument[.]" *Id.* at 663.

Finally, in *Smith*, police executed a search warrant and obtained large quantities of suspected drugs that were sent to a state crime lab and tested by Analyst Elizabeth Rast. 602 U.S. at 789-90. Rast prepared a set of typed notes and signed a report that documented, for each of the items tested: a description of the item; the weight of the item and how she measured that weight; the test performed on the item, including whether she ran a test "blank" on the equipment; the results of those tests; and a conclusion that the

24

items tested contained usable quantities of methamphetamine, marijuana, and cannabis. *Id.* at 790.

In the weeks leading up to trial, Rast ceased working at the crime lab. *Id.* The prosecution therefore called Greggory Longoni, a forensic scientist that had no previous connection to the case, to testify about his "independent opinion on the drug testing performed by Rast." *Id.* Relying on Rast's records, Longoni arrived at the same conclusions as Rast, and when he testified he related what was in her records item by item. *Id.* at 791. The Arizona Court of Appeals upheld this practice on the basis that Analyst Rast's records did not come in for the truth of what they asserted but, rather, to demonstrate the basis for Longoni's opinions. *Id.* at 791-92. The *Smith* Court rejected that reasoning and held that "[i]f an expert for the prosecution conveys an out-of-court statement in support of his opinion, and the statement supports that opinion only if true, then the statement has been offered for the truth of what it asserts." *Id.* at 795. As Rast's report could have only supported Longoni's conclusions if what was stated in her report was true, the Court concluded that Longoni improperly testified to hearsay statements contained in the report. *Id.* at 798-800. Consequently, the Court concluded that if Rast's report was also testimonial, the defendant's right to confrontation would have been violated. *Id.* at 800. As that issue was not properly before it, it remanded to the Arizona Court of Appeals for further proceedings. *Id.* at 800-03.

Thus, it is clear that the Confrontation Clause, although certainly applicable to forensic evidence, applies only to forensic evidence that is

25

testimonial hearsay. It follows, then, that any Confrontation Clause inquiry raises two questions: does the evidence at issue constitute hearsay and, if so, is that hearsay testimonial? Neither the United States Supreme Court nor this Court have addressed that inquiry as it relates to the category of evidence at issue here: raw, machine produced data that contains no human input, conclusions, or assertions. After thorough review, we hold as a matter of first impression that raw, machine extracted Cellebrite data that is devoid of any human input, conclusions, or assertions does not implicate the Confrontation Clause because it is not testimonial hearsay.

The Kentucky Rules of Evidence define "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." KRE 801(c). "Declarant" is in turn defined as "a *person* who makes a statement[,]" KRE 801(b) (emphasis added), while "statement" is defined as either "[a]n oral or written assertion" or "[n]onverbal conduct *of a person*, if it is intended *by the person* as an assertion." KRE 801(a)(1)-(2) (emphasis added).

The first question we must address, then, is: who is the alleged declarant here? It cannot be the Cellebrite analyst who conducted the extraction, as that individual made no "statement." KRE 801(b). He or she simply extracted the data, placed it on an encrypted drive, and mailed it back to the requesting officer. The analyst did not make any written, oral, or nonverbal assertions regarding the data. KRE 801(a)(1)-(2). Indeed, the analyst would have likely

26

been unable to make any assertions or conclusions about the data because it had not yet been "translated" into a readable format by Physical Analyzer. And while we do not know what process the analyst used to bypass the passcode on Baldwin's cellphone, that process would not have altered the data that was already present on the phone; it simply opened the door to it. And with that door opened, the only thing left to do was extract the data. Tpr. Gabhart testified that in the absence of a passcode, performing an extraction is as simple as plugging the phone into Cellebrite's forensic equipment and downloading the extracted data to a computer. The analyst simply had no part in creating the data or drawing conclusions about what it contained.

Consequently, the only other possible "declarant" is the computer the Cellebrite analyst used to extract and download the data. But to conclude that the computer was the declarant, we would have to hold that a computer is a person. KRE 801(b) ("A 'declarant' is a person who makes a statement."). We decline to do so as KRE 801 is plainly limited on its face to statements made by human beings. Consequently, we hold that the raw data extraction was not a hearsay statement, and that the Confrontation Clause was not implicated by the admission of the photographs obtained from it.

We find support for this holding in the federal circuit courts, as a majority of them have reached the same conclusion based on the definition of hearsay under the Federal Rules of Evidence, which similarly define a hearsay "declarant" as "the person who made the statement." FRE 801(b). *See United*

27

*States v. Juhic*, 954 F.3d 1084, 1089 (8th Cir. 2020) ("Machine-generated records usually do not qualify as 'statements' for hearsay purposes but can become hearsay when developed with human input."); *United States v. Lizarraga-Tirado*, 789 F.3d 1107, 110 (9th Cir. 2015) ("Because the program makes the relevant assertion. . . there's no statement as defined by the hearsay rule.  In reaching that conclusion, we join other circuits that have held that machine statements aren't hearsay."); *United States v. Lamons*, 532 F.3d 1251, 1263-64 (11th Cir. 2008) (holding that a machine generated compact disk of data automatically collected from phone calls made to an airline's corporate toll-free number was not hearsay because it was not a statement by a human); *United States v. Moon*, 512 F.3d 359, 361-62 (7th Cir. 2008) (holding that a machine cannot be a declarant for the purposes of the rule against hearsay); *United States v. Washington*, 498 F.3d 225, 231 (4th Cir. 2007) ("[T]his raw data generated by the machines were not hearsay statements as implicated by the Confrontation Clause. . . Only a person may be a declarant and make a statement.  Thus, 'nothing "said" by a machine. . . is hear-say.'"); *United States v. Hamilton*, 413 F.3d 1138, 1142 (10th Cir. 2005) ("[T]he. . . information was automatically generated by the computer. . . without the assistance or input of a person. . . there was neither a 'statement' nor a 'declarant' involved here within the meaning of Rule 801."); *United States v. Khorozian*, 333 F.3d 498, 506 (3d Cir. 2003) ("'[U]nder FRE 801(a), a statement is something uttered by 'a person,' so nothing 'said' by a machine. . . is hearsay.'").

A host of appellate courts from our sister states have likewise held that a machine cannot be a declarant that makes a hearsay statement absent some form of human input. *See State v. Lester*, 910 S.E.2d 642, 649 (N.C. 2025); *Commonwealth v. Wallace*, 289 A.3d 894, 905 (Pa. 2023); *Wade v. State*, 156 So. 3d 1004, 1024-25 (Fla. 2014); *State v. Buckland*, 96 A.3d 1163, 1169-72 (Conn. 2014); *State v. Kandutsch*, 799 N.W.2d 865, 879-80 (Wis. 2011), *superseded on other grounds by statute as stated in In re Commitment of Jones*, 911 N.W.2d 97 (Wis. 2018); *Commonwealth v. Thissell*, 928 N.E.2d 932, 937 n.13 (Mass. 2010); *Bryan v. State*, 903 S.E.2d 160, 168 (Ga. Ct. App. 2024); *Gore v. State*, 605 S.W.3d 204, 209 (Tex. Ct. App. 2020); *People v. Rodriguez*, 224 Cal. Rptr. 3d 295, 314 (Cal. Ct. App. 2017); *Baker v. State*, 762, 117 A.3d 676, 683 (Md. Ct. App. 2015); *State v. Ziegler*, 855 N.W.2d 551, 556 (Minn. Ct. App. 2014); *Cranston v. State*, 936 N.E.2d 342, 344 (Ind. Ct. App. 2010); *People v. Dinardo*, 801 N.W.2d 73, 79 (Mich. Ct. App. 2010); *People v. Buckner*, 228 P.3d 245, 250 (Colo. Ct. App. 2009); *Wimbish v. Commonwealth*, 658 S.E.2d 715, 720 (Va. Ct. App. 2008); *State v. Van Sickle*, 813 P.2d 910, 913 (Idaho Ct. App. 1991).

Moreover, the sparse number of jurisdictions that have specifically addressed the interplay of the Confrontation Clause with cellphone data extractions have held that the raw, machine produced data from an extraction, alone, does not constitute testimonial hearsay and therefore does not implicate the Confrontation Clause.

In *Hill*, the Fifth Circuit opinion relied upon by the trial court below, several defendants were convicted for their involvement in a scheme to rob armored vehicles as they restocked automated teller machines. 63 F.4th at 342. Special Agent Jeffrey Coughlin testified to information extracted from the defendants' cellphones, and the defendants objected on Sixth Amendment grounds because Agent Coughlin "did not personally extract the reports from their cellphones or observe the extraction[.]" *Id.* at 357.

The Fifth Circuit noted its previous opinions which, reviewing for plain error,[16] held that the admission of GPS cellphone tracking reports containing only "raw, machine-produced data" was not error. *Id.* at 358 (citing *United States v. Waguespack*, 935 F.3d 322, 333-34 (5th Cir. 2019); *United States v. Ballesteros*, 751 Fed. Appx. 579, 579-80 (5th Cir. 2019) (unpublished)). It also recognized, as we have already discussed, that several other federal circuit courts have held "that 'machine statements aren't hearsay.'" *Id.* (citing *Lizarraga-Tirado*, 789 F.3d at 1110; *Lamons*, 532 F.3d at 1263; *Moon*, 512 F.3d at 362; *Washington*, 498 F.3d at 230; *Hamilton*, 413 F.3d at 1142; *Khorozian*, 333 F.3d at 506).

Finally, it highlighted that the *Bullcoming* Court "emphasized that the report in question there 'contained not only raw, machine-produced data, but also representations relating to past events and human actions,' e.g., the

---

[16] The federal courts' standard for plain error review is comparable to Kentucky's standard of review for palpable error. *Compare* Fed. R. Crim. P. 52(b) *with* RCr 10.26.

30

validity of the analysis or the integrity of the sample." 63 F.4th at 359. Based on the foregoing, the *Hill* Court held that "the extraction reports at issue here were non-testimonial, raw machine created data[,]" because "[k]ey differences exist between test reports generated by a person's analysis and test reports which are the result of machine analysis." *Id.* at 359. *See also State v. Green*, 543 P.3d 484, 489-93 (Idaho 2024); *Pena v. State*, ---- S.W.3d ----, 2024 WL 5081673 (Tex. Crim. App. Dec. 12, 2024); *State v. Lautanen*, 217 N.E.3d 59 (Ohio Ct. App. 2023); *People v. Abad*, 490 P.3d 1094, 1104-07 (Colo. App. 2021).

By way of contrast, the Fourth Circuit's opinion in *United States v. Arce*, demonstrates an example of when extracted cellphone data is considered testimonial because it contains human input or conclusions. 49 F.4th 382 (4th Cir. 2022). In *Arce,* the defendant was convicted of receiving and possessing child pornography based on the child pornography materials found on his cellphone. *Id.* at 385. During the defendant's trial, several Cellebrite reports "which included all the information extracted from the phone, not just the charged images" were introduced into evidence through the testimony of an Agent Montoya. *Id.* at 391. The defendant challenged the admission of the reports on Sixth Amendment grounds. *Id.* The Fourth Circuit held that "[t]hough most of [the] reports contained only non-testimonial evidence. . . one report included testimonial statements categorizing the images as likely child pornography." *Id.*

The *Arce* Court explained that while "in general, when 'machines generate[] data. . . through a common scientific and technological process,' the operators of those machines do not make a 'statement' under the Confrontation Clause. . . characterizations of, or conclusions drawn from[] the data are statements." *Id.* at 392 (citing *Washington*, 498 F.3d at 230; *Moon*, 512 F.3d 362). Agent Montoya testified that after he extracted an image using Cellebrite, he would enter it into the Griffeye database "which uses a hashing algorithm to identify unique images and match them with known child-pornography images. A hashing algorithm generates for a given image an alphanumeric identifier, which, essentially, is unique to that image." *Id.* at 389.

As part of Agent Montoya's investigation, he "compared the hash values of images from Arce's phone to [the Griffeye] database of 'known' child-pornography images that Griffeye created using input from law enforcement officers." *Id.* at 392. In turn, the Cellebrite report used those hash values to label images as child abuse material or child exploitation material. *Id.* The Court explained that a statement in the Cellebrite report that a given image was child exploitation or abuse material depended on two premises. *Id.* at 393. The first was that a given image in the Griffeye database was in fact child exploitation or abuse material, which "derives from unknown law enforcement officers' judgments that certain images qualify." *Id.* The second premise was that "the hash value of one of the known images matches that of an image found in the Cellebrite download." *Id.* The Court held:

32

It is the first of these premises that creates a Confrontation Clause problem. The second premise—the hash values match—may just be the kind of machine-generated data from a common technological process that is non-testimonial. *See Washington*, 498 F.3d at 230 & n.2. But the first premise—a given image in the Griffeye database is child exploitation or abuse material—is classic testimonial evidence. That conclusion depends on the judgment of law enforcement that a given image is child pornography. And that judgment is made for the purpose—or at least the foreseeable result—of identifying and prosecuting criminal cases. So the statements in the Cellebrite report identifying a given image is Child Exploitation Material or Child Abuse Material are testimonial. And including those testimonial statements violated Arce's Confrontation Clause rights.

*Id.* The Court concluded by holding that any error in admitting the portions of the Cellebrite reports that contained testimonial statements was harmless, as the report's statement that a given image was child pornography was duplicative of the actual photographs of child pornography that were admitted. *Id.*

In this case, the Cellebrite analyst that extracted the raw data from Baldwin's cellphone did not make any testimonial statements about that data or provide any input to produce that data. The analyst simply extracted the data and sent it back in its raw form, and raw, purely machine generated data is not testimonial hearsay. The only two individuals that translated the data and/or made conclusions that it contained child pornography—Det. Friend and Tpr. Gabhart—were subjected to cross examination by Baldwin. This Court is satisfied that Baldwin's Confrontation Clause rights were not violated because they were never implicated to begin with, and we affirm.

## 2) *The photographs were properly authenticated.*

Baldwin further alleges that the trial court erred by finding that the Commonwealth properly authenticated the photographs of child pornography because it did not prove that the data extraction was what it purported to be: a digital copy of the data on his cellphone.

At trial, Tpr. Gabhart testified prior to Det. Friend. During a bench conference before Tpr. Gabhart's testimony the Commonwealth notified the court of its intention to use the Certification signed by Mr. Raspante to question Tpr. Gabhart and to authenticate the data extraction to later admit the images of child pornography. The Commonwealth contended the Certification was admissible as a business record. *See* KRE 803(6). The Certification provided the date the phone was received at Cellebrite; the UPS tracking number associated with its delivery; and the phone's make, model, and International Mobile Equipment Identity (IMEI) number.[17] It further stated that when the analyst completed the data extraction, all of the evidence was placed in a sealed evidence bag and mailed back; the UPS tracking number for that shipment was also provided. The Certification stated that the device never left the custody or control of Cellebrite and that Cellebrite did not examine or alter any of the data on the device. The Certification was signed by Mr. Raspante under penalty of perjury.

---

[17] An IMEI number is a unique serial number assigned to a particular cellphone.

The trial court denied the Commonwealth's request to enter the Certification into evidence because it contained testimonial statements. Notwithstanding, the court noted that the Certification had previously been made part of the record[18] and that it provided *prima facie* evidence that the raw data was what the Commonwealth purported it to be. In other words, while the Certification was inadmissible it still served to authenticate the raw data extracted from the phone. Thus, the photographs obtained from the extraction would be admissible if the Commonwealth met the other evidentiary hurdles for admission.

Following that ruling, Tpr. Gabhart testified to the chain of custody recounted in Section II(B) above. He stated he recorded the cellphone's IMEI number before mailing it to Cleveland in tamper resistant packaging and that the Cleveland agents did not report to him that the package had been tampered with in any way when they received it. When he later received the phone and other evidence back from Cleveland, it arrived in tamper resistant packaging with its seal intact. He verified it was the same phone he sent using the IMEI number and ultimately returned all of the evidence he received from Cleveland to Det. Friend. Det. Friend testified that he recorded the phone's make, model, and IMEI number prior to hand delivering it to Tpr. Gabhart in an evidence package sealed with evidence tape. He demonstrated to the jury where the

---

[18] The Commonwealth filed a pre-trial memorandum addressing authentication and chain of custody issues and attached the Certification as an exhibit to the memorandum.

IMEI number was engraved on the back of Baldwin's phone. He further noted that the Cellebrite Physical Analyzer report in this case included the same IMEI number.

After the foregoing testimony, the Commonwealth moved to admit the images of child pornography extracted from the phone. The defense renewed its previous objection based on a lack of authentication. The trial court overruled the objection, and found:

> I believe based on the [Certification] the court reviewed that the Commonwealth has made a *prima facie* showing that the clone drive is what it purports to be. The testimony today by these two officers that reflects on chain of custody and their standard operating procedures tends to validate its trustworthiness. And I mean that in the sense that it gets past the court's gatekeeping function. I don't mean that in the sense that it's not subject to cross examination, as I've said [inaudible] to cross-examine and I think that's where it goes at this point: to the weight of the evidence and not its admissibility.

We agree.

The Kentucky Rules of Evidence state that "[t]he requirement of authentication. . . as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what the proponent claims." KRE 901(a). The Commonwealth's burden under KRE 901 is slight and requires only a *prima facie* showing that the material is a true and accurate reflection of what it is purported to be. *See Sanchez v. Commonwealth*, 680 S.W.3d 911, 926 (Ky. 2023) (quoting *Brafman v. Commonwealth*, 612 S.W.3d 850, 866 (Ky. 2020); *Kays v. Commonwealth*, 505 S.W.3d 260, 270 (Ky. App. 2016)). Whether sufficient evidence is presented to

36

authenticate a given piece of evidence is within the sound discretion of the trial court, and we review that ruling for abuse of discretion. *Brafman*, 612 S.W.3d at 866. This Court will uphold a trial court's finding that a piece of evidence was properly authenticated unless that ruling was "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky.1999).

We hold that the trial court acted well within its discretion by ruling that the data extraction was properly authenticated. Based on the evidence recounted above, the Commonwealth presented more than enough evidence to overcome its slight burden of demonstrating that the data extraction was a true and accurate copy of all the data housed on Baldwin's cellphone at the time it was seized. We would only add that, in addition to the Certification and the officers' testimony about chain of custody and their evidence handling protocols, several items found in the data itself served to further authenticate the evidence. In particular, it contained photographs of Baldwin, his vehicle, his home; his social media accounts; Tina's contact information; and photographs of John that were both criminal and non-criminal. No error occurred, and we affirm.

### C. Alleged Prosecutorial Misconduct

Baldwin next asserts that the Commonwealth committed prosecutorial misconduct in its opening statement and closing argument during the guilt phase of his trial. He concedes that none of his arguments were preserved by contemporaneous objection, but requests review for palpable error. RCr 10.26.

37

Prosecutorial misconduct is "'a prosecutor's improper or illegal act involving an attempt to persuade the jury to wrongly convict a defendant or assess an unjustified punishment.'" *Murphy v. Commonwealth*, 509 S.W.3d 34, 49 (Ky. 2017) (quoting *Commonwealth v. McGorman*, 489 S.W.3d 731, 741-42 (Ky. 2016)). When the alleged misconduct is challenged by an objection, we will reverse "if proof of the defendant's guilt was not such as to render the misconduct harmless, and if the trial court failed to cure the misconduct with a sufficient admonition to the jury." *Murphy*, 509 S.W.3d at 49 (quoting *Duncan v. Commonwealth*, 322 S.W.3d 81, 87 (Ky. 2010)) (internal quotation marks omitted). But when, as here, the defendant fails to object to the alleged misconduct, this Court "'will reverse only where the misconduct was flagrant and was such as to render the trial fundamentally unfair.'" *Murphy*, 509 S.W.3d at 49 (quoting *Ordway v. Commonwealth*, 391 S.W.3d 762, 789 (Ky. 2013)).

The four-part test utilized to determine whether alleged misconduct was flagrant is: "(1) whether the remarks tended to mislead the jury or to prejudice the accused; (2) whether they were isolated or extensive; (3) whether they were deliberately or accidentally placed before the jury; and (4) the strength of the evidence against the accused." *Murphy*, 509 S.W.3d at 49. When applying this test, we must also bear in mind that "opening [statements] and closing arguments are not evidence and prosecutors have a wide latitude during both." *Stopher v. Commonwealth*, 57 S.W.3d 787, 805-06 (Ky. 2001). And, that "[i]n the end, our review must center on the essential fairness of the trial as a whole,

38

with reversal being justified only if the prosecutor's misconduct was 'so improper, prejudicial, and egregious as to have undermined the overall fairness of the proceedings.'" *Dickerson v. Commonwealth*, 485 S.W.3d 310, 329 (Ky. 2016) (quoting *Brewer v. Commonwealth*, 206 S.W.3d 343, 349 (Ky. 2006)).

Baldwin first argues against a statement made by the Commonwealth during its closing argument. For context, we note that all sixty-eight images of child pornography were briefly displayed on a television screen for the jury as Det. Friend read the concomitant description of each image from Baldwin's indictment. During closing argument, after the Commonwealth's Attorney asserted that all of the circumstantial evidence presented pointed to Baldwin knowingly possessing child pornography on his phone, she said:

> And I will ask you this, if you were wondering whether Mr. Baldwin had any interest in those images, whether they are something he might like to look at, did you notice him while we were showing them? He couldn't take his eyes off it. He could not take his eyes off it. One last look. One last chance to see those little kids.[19]

Baldwin argues that he had a constitutional right, absent any disruptive behavior, to be present at all stages of the proceedings against him and that this right included the right to view the evidence presented against him in the midst of trial. U.S. Const. amend. VI; U.S. Const. amend. XIV; Ky. Const. § 11. He therefore contends that this comment was analogous to the Commonwealth

---

[19] While Baldwin's appellant brief does not directly classify this statement as alleged prosecutorial misconduct, that assertion is at the core of his argument. We therefore address it as such.

commenting on his right to remain silent and was an "improper manipulation tactic to ensure a conviction." We disagree.

To determine if this comment was flagrant misconduct, we first ask whether the remark tended to mislead the jury or prejudice the defendant. The statement was certainly not misleading. The video record in this case demonstrated that when the images of child pornography were being displayed in the courtroom, Baldwin kept his focus primarily on the television screen. But, given that the statement would have been prejudicial to Baldwin, this factor weighs in his favor. Next, the challenged comment was isolated, and therefore weighs in favor of the Commonwealth. Third, the comment was deliberately placed before the jury, and we must weigh this factor in Baldwin's favor. But we note that the jury was likely able to see and assess the body language of Baldwin in the moments where the images were portrayed as well.

Finally, and most significantly, the strength of the evidence against Baldwin for the offense of possession of child pornography was overwhelming. All sixty-eight images were found on Baldwin's personal, passcode protected cellphone, and all the non-criminalized data that was extracted from it demonstrated that the phone belonged to him (photographs of him, his social media accounts, Tina's contact information, etc.). Moreover, when the final image of child pornography was placed on the phone approximately one hour before Det. Friend seized it on January 6, 2019, the only two people present in Baldwin's home were himself and John. Baldwin asserted no logical explanation for how those images came to be on his phone without his

40

knowledge, and the sheer number of images alone tends to refute any contention that he was unaware he possessed them. We hold no flagrant prosecutorial misconduct occurred from this argument.

Baldwin's next arguments address what he deems "emotional outbursts" by the Commonwealth's Attorney during her opening statement and closing argument. Towards the end of her opening statement, the Commonwealth discussed the reasons John had not told anyone what Baldwin was doing to him. She then said:

> I think, in this case, if you pay attention to how the investigation progresses and how the evidence and the information builds, you will see that if [Jane], at four years old, hadn't been brave enough to tell her parents—sorry—what had happened to her, we likely would have never known what was happening to [John].

When the Commonwealth's Attorney said "sorry" her voice cracked, and it was apparent that she became emotional momentarily. However, she recovered quickly and continued with composure. Later, the Commonwealth began its closing argument by thanking the jurors for their service and by thanking Jane's parents and Det. Friend. Her voice again cracked as though she were about to cry, and she said:

> I'm sorry you all, I do get, and I don't mean to get emotional, and I'm going to try, it's just very hard to walk in this courtroom and not still be a mom and not still be a human being and dealing with the issues that we're talking about today is emotional.

Again, she quickly regained her composure and continued her argument.

Neither of these instances, which can hardly be classified as emotional outbursts in the first place, can be deemed flagrant prosecutorial misconduct. First, there is nothing in the record to suggest that the prosecutor's brief

41

displays of emotion were some kind of gamesmanship calculated in advance to manipulate the jury. Prosecutors are human beings, and we cannot command them to remain emotionally numb or indifferent. This is particularly true in cases where children are victimized by adults and there are disturbing images that must be put before the jury. Though that is not to say that excessive, disingenuous displays of emotion by a prosecutor could never be considered improper. But that did not occur in this case. Notwithstanding, we cannot dispute that the prosecutor's emotions could have tended to prejudice Baldwin, and we must therefore weigh this factor in his favor.

However, the second, third, and fourth factors weigh in the Commonwealth's favor: these instances were isolated, as they occurred twice over the course of a three-day trial; there is no indication the Commonwealth's Attorney deliberately became emotional and she appeared to be embarrassed by it. Additionally, the evidence of Baldwin's guilt was overwhelming. Not only was there proof regarding dozens of counts of possession of child pornography discussed above, but the Commonwealth also presented testimony from both Jane and John. Jane was four years old when she disclosed the abuse. At that age, she had no reason to have had any exposure to, or knowledge of, what oral sex is. Yet she came home after being babysat solely by Baldwin and immediately told her mother that Baldwin had shown her an image of two individuals engaged in oral sex and that he proceeded to do the same thing to her. She presumably told the forensic interviewer the same thing during her CAC interview, as Det. Friend sought an arrest warrant for Baldwin after it,

42

and, four years later, she testified to the same thing during Baldwin's trial.
John's testimony was equally damning. In addition to testifying about the
numerous instances of physical sexual abuse he endured, John testified that
Baldwin would take nude pictures of him, and those very images were found on
Baldwin's cellphone. Based on the forgoing, we cannot hold that flagrant
prosecutorial misconduct occurred.

**D. Double Jeopardy**

Baldwin next argues that his right to be free from double jeopardy was
violated when one nude image of John was used to convict him of both use of a
minor in a sexual performance, KRS[20] 531.310, and possession of a matter
portraying a sexual performance by a minor, KRS 531.335. He concedes this
alleged error is not preserved. Nevertheless, "we will review for palpable error,
as we have held. . . that failure to present a double jeopardy argument to the
trial court should not result in allowing a conviction which violates double
jeopardy to stand." *Clark v. Commonwealth*, 267 S.W.3d 668, 674–75 (Ky.
2008); *see also Walden v. Commonwealth*, 805 S.W.2d 102, 105 (Ky. 1991).

The Double Jeopardy Clause of the Fifth Amendment to the United
States Constitution demands that "no person shall be subject for the same
offence (sic) to be twice put in jeopardy of life or limb[.]" U.S. Const. amend. V;
U.S. Const. amend. XIV. The Constitution of Kentucky provides nearly
identical protections. Ky. Const. § 13 ("No person shall, for the same offense,

---

[20] Kentucky Revised Statute.

43

be twice put in jeopardy of his life or limb[.]"). Kentucky follows the touchstone *Blockburger*[21] test to determine whether a defendant's double jeopardy rights have been violated. *Commonwealth v. Burge*, 947 S.W.2d 805, 811 (Ky. 1996). Under that test, "[d]ouble jeopardy does not occur when a person is charged with two crimes arising from the same course of conduct, as long as each statute 'requires proof of an additional fact which the other does not.'" *Id.* at 809 (quoting *Blockburger*, 284 U.S. at 304); *see also* KRS 505.020(1)(a) and (2)(a) (codifying the *Blockburger* test). We must examine whether KRS 531.310 (the "use statute") requires proof of a fact that KRS 531.335 (the "possession statute") does not and vice versa.

Pursuant to KRS 531.310, "A person is guilty of the use of a minor in a sexual performance if he. . . induces a minor to engage in a sexual performance." The jury instructions for this offense reflected this statutory language by requiring proof beyond a reasonable doubt:

> A. That in this county between December 24, 2018, and January 6, 2019, and before the finding of the Indictment herein, [Baldwin] knowingly induced [John] to engage in a sexual performance;
>
> AND
>
> B. That [John] was less than 16 years of age.

In contrast, the statute that prohibits the possession of a matter portraying a sexual performance by a minor, KRS 531.335, provides in relevant part:

> (1) A person is guilty of possession. . . of matter portraying a sexual performance by a minor when, having knowledge of its

---

[21] *Blockburger v. United States*, 284 U.S. 299 (1932).

content, character, and that the sexual performance is by a minor, he[:]

(a) Knowingly has in his. . . possession or control any matter which visually depicts an actual sexual performance by a minor person[.]

Baldwin's jury instruction for the first of sixty-eight counts of possession of a matter portraying a sexual performance by a minor reflected this statute by requiring proof beyond a reasonable doubt:

A. That in this county on or about January 6, 2019, and before the finding of the Indictment herein, [Baldwin] knowingly had in his possession or control any matter visually depicting an actual sexual performance by a minor; (Five Duplicates of the image he created of [John's] penis.)

AND

B. That when he did so, he had knowledge of the content and character of the matter and knew that the person engaged in the sexual performance was a minor.

The instructions further defined "sexual performance" as "any performance or part thereof which includes sexual conduct by a minor[,]" and defined "performance" as follows: "any play, motion picture, photograph, or dance. Performance also means any other visual representation exhibited before an audience."

We hold that Baldwin's rights against double jeopardy were not violated by his convictions under these statutes that each concerned the same photograph of John. Under these facts, the "use statute" required proof that Baldwin induced John to engage in a sexual performance. KRS 531.310. The "possession statute" has no such factual requirement, as it criminalizes only the knowing possession or control of a matter that depicts a sexual

45

performance by a minor.  KRS 531.335(2)(a).  Similarly, the "possession

statute" requires proof of knowing possession of a matter that depicts a sexual

act by a minor but does not require that the defendant be the individual that

induced the minor to create that matter.  Put simply, Baldwin's action in

inducing John to engage in a sexual performance by allowing Baldwin to take a

sexually explicit photograph of him was a separate and distinct crime from his

knowing possession of that photograph thereafter.  As the *Blockburger* test was

clearly satisfied, no violation of Baldwin's right to be free from double jeopardy

occurred.

## E. Directed Verdict

Baldwin next asserts that the trial court erred by denying his motion for

directed verdict for the count of first-degree rape perpetrated against Jane

based on his argument that the Commonwealth failed to prove that Baldwin's

finger penetrated Jane's vagina.  *See* KRS 510.040(1)(b) (defining rape in the

first degree); KRS 510.010(8) (defining sexual intercourse).

During Jane's testimony the Commonwealth sought to prove the offense

of first-degree rape by eliciting the following testimony:

> **CW:**[22] Let's talk just for a second more about this.  When you say
> he touched you with his fingers, where on your body did his fingers
> touch you?
>
> **Jane:** I think it was inside.
>
> **CW:** Okay, was it the part of your private like where your panties
> touch you, or the part of your private where your panties don't
> touch you?

---

[22] Commonwealth.

46

**Jane:** I don't remember.

**CW:** Okay, but you think it was inside?

**Jane:** I think.

At the close of the Commonwealth's evidence, defense counsel argued Baldwin was entitled to a directed verdict on the first-degree rape charge because Jane testified that she did not know if Baldwin's finger penetrated her. The Commonwealth responded that Jane said she thought his fingers touched her on the inside and that was enough evidence to submit the charge to the jury. The trial court agreed with the Commonwealth and denied the motion. Following the conclusion of all of the evidence, defense counsel renewed his motion for directed verdict on the first-degree rape charge on the same grounds and it was again denied.

Immediately after defense counsel's renewed motion was denied, the parties and the court began preliminary discussions about the jury instructions. Given Jane's testimony, the Commonwealth raised the issue of providing an instruction for the lesser included offense of first-degree sexual abuse. It clarified that it was not requesting that instruction but was raising it as an issue for consideration. Defense counsel requested time to confer with Baldwin before stating his position on providing the lesser included offense instruction. As it was late in the evening, it was agreed that discussions would continue the following morning.

The next morning, defense counsel informed the court that it would not be requesting the lesser included instruction. The Commonwealth likewise did

47

not request the instruction and left the decision to the court's discretion. The trial court opted to provide the first-degree sexual abuse instruction, as it found that a reasonable juror could have doubted Baldwin's guilt for the offense of first-degree rape and find him guilty of first-degree sexual abuse. *See, e.g., Webb v. Commonwealth*, 904 S.W.2d 226, 229 (Ky. 1995) ("An instruction on a lesser-included offense should be given if the evidence is such that a reasonable juror could doubt that the defendant is guilty of the crime charged, but conclude that he is guilty of the lesser-included offense.").

During the Commonwealth's closing argument, it was candid with the jury about the reason the first-degree sexual abuse instruction was included. It acknowledged that it did not do the best job in formulating the questions it asked Jane regarding that offense. Nevertheless, it argued that when Jane was asked if Baldwin's finger touched her on the inside or the outside, she responded she thought it was on the inside. The Commonwealth explained to the jury that if they believed there was any penetration by Baldwin, no matter how slight, then it could find him guilty of first-degree rape. But, if it did not believe penetration occurred, it should find him guilty of first-degree sexual abuse. As previously noted, the jury found Baldwin guilty of first-degree rape and not the lesser included offense of first-degree sexual abuse.

Baldwin's motions for directed verdict at the trial court level properly preserved this issue for our review. *See Ray v. Commonwealth*, 611 S.W.3d 250, 266 (Ky. 2020). And we must determine whether, under the evidence, it

48

was clearly unreasonable for the jury to find Baldwin guilty of first-degree rape. *Commonwealth v. Benham,* 816 S.W.2d 186, 187 (Ky. 1991).

Baldwin's argument before this Court compares the facts of this case to those of *Sharp v. Commonwealth,* 849 S.W.2d 542 (Ky. 1993) in asserting that Jane's testimony was insufficient to prove penetration occurred. In *Sharp,* the appellant was convicted of numerous sexual offenses against his former stepdaughters. *Id.* at 543. He argued before this Court that he was entitled to a directed verdict on the charge of first-degree rape against the younger of the two children, N.S., because the Commonwealth failed to prove penetration occurred. *Id.* at 547. N.S., who was between 4 ½ and 6 ½ years old at the time the crimes occurred, testified that the appellant "touched her 'middle part' with his 'middle part' or 'private thing' and that the act 'hurt.'" *Id.* The Commonwealth also produced medical records from several years after the offense indicating that N.S.' hymen had been penetrated in the distant past. *Id.* at 547-48. The *Sharp* Court held that "[w]hile such evidence was slight, it was sufficient." *Id.* at 548.

Baldwin argues that, in contrast to *Sharp,* Jane did not testify that she experienced any pain, and the Commonwealth did not present medical records suggesting that penetration occurred. While those assertions are true, they do not mean that Baldwin was entitled to a directed verdict. A trial court may not grant a defendant's motion for a directed verdict "if the prosecution produces. . . more than a mere scintilla of evidence." *Benham,* 816 S.W.2d at 187-88.

49

While we concede that this is a close case, we conclude that the Commonwealth presented more than a mere scintilla of evidence that penetration occurred. Jane, who was four years old at the time of the offense and eight years old when she testified, was posed a non-leading question by the Commonwealth: "Where on your body did his fingers touch you?" and Jane responded, "I think it was inside." Based on this testimony we cannot hold that it would have been clearly unreasonable for the jury to find Baldwin guilty of first-degree rape. In addition, we consider it significant that the Commonwealth explained to the jury during its closing argument that if the jury did not believe any penetration occurred it should find Baldwin guilty of first-degree sexual abuse and yet it still found Baldwin guilty of first-degree rape. Further, the trial court properly considered the possibility that the jury might believe that no penetration occurred and instructed on the lesser charge.

## F. Cumulative Error

In the event this Court held that more than one of the foregoing issues resulted in non-reversible error, Baldwin requests reversal under the cumulative error doctrine. That doctrine is used "only to address 'multiple errors, [which] although harmless individually, may be deemed reversible if their cumulative effect is to render the trial fundamentally unfair.'" *Elery v. Commonwealth*, 368 S.W.3d 78, 100 (Ky. 2012) (quoting *Brown v. Commonwealth*, 313 S.W.3d 577, 631 (Ky.2010)). As we conclude no error occurred in the underlying trial, the doctrine is inapplicable.

50

## III.   CONCLUSION

Based on the foregoing, we affirm.

All sitting.  Bisig, Conley, and Goodwine, JJ., concur. Keller and Thompson, JJ.; concur in result only. Nickell, J., concurs in result only by separate opinion, in which Thompson, J., joins.

NICKELL, J., CONCURRING IN RESULT ONLY:  I concur with much of the majority's well-reasoned opinion, particularly its resolution of the confrontation and hearsay issues relative to the extraction of data from Baldwin's cellphone.  However, I differ from the majority's authentication analysis and write separately to clarify my view that inadmissible evidence may not be used for the purpose of authentication under KRE[23] 901(a) and KRE 104(b).  Therefore, I respectfully concur in result only.

The threshold requirement for ensuring the authenticity—or the genuineness and reliability—of proffered evidence is set forth in KRE 901(a), which reads:

> The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

This Court has held this burden for authenticating tendered evidence is minimal and "only a prima facie showing of authenticity is required." *Sanders v. Commonwealth*, 301 S.W.3d 497, 501 (Ky. 2010) (citing *Johnson v. Commonwealth*, 134 S.W.3d 563, 566 (Ky. 2004)).

---

[23] Kentucky Rules of Evidence.

More particularly, this Court has held authentication under KRE 901 is a preliminary question of conditional relevancy under KRE 104(b), which provides, "[w]hen the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition." *Johnson*, 134 S.W.3d at 566. In short, Kentucky precedent holds "[t]he condition of fact which must be fulfilled by every offer of real proof is whether the evidence is what its proponent claims." *Id.* (quoting *United States v. Reilly*, 33 F.3d 1396, 1404 (3rd Cir. 1994).

Importantly, preliminary questions of conditional relevancy under KRE 104(b) are distinct from preliminary questions involving the "competency" of evidence under KRE 104(a). Robert W. Lawson, 1 *Kentucky Evidence Law Handbook* § 1.15[2] (2019). KRE 104(a) states:

> Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b) of this rule. In making its determination it is not bound by the rules of evidence except those with respect to privileges.

Under the plain language of KRE 104(a), the trial court alone determines the competency of evidence and may rely upon inadmissible evidence, such as hearsay, to resolve this preliminary question. *Gerlaugh v. Commonwealth*, 156 S.W.3d 747, 753 (Ky. 2005) (citing *Bourjaily v. United States*, 483 U.S. 171, 181 (1987)).

By contrast, KRE 104(b) divides the decision-making authority on questions of conditional relevance between the trial court and jury. Lawson, *Kentucky Evidence Law Handbook*, at § 1.15[3][b]. Essentially, the proper procedure is twofold:

> (1) The judge screens the foundational testimony for the jury. The judge accepts the proponent's foundational testimony at face value and inquires only: If the jury chooses to believe this testimony, does it have sufficient probative value to support a permissive inference of the existence of the preliminary fact? If the answer is no, the judge sustains the objection, excluding the foundational testimony and the proffered item of evidence.
>
> (2) If the answer is yes, the judge overrules the objection, admitting the foundational testimony and the proffered item of evidence. The jury later makes the real factual determination.

Robert P. Mosteller, 1 *McCormick On Evid.* § 53 (9th ed. 2025) (citing *United States v. Maritime Life Caribbean Limited*, 913 F.3d 1027, 1032-33 (11th Cir. 2019)).

In *Huddleston v. United States*, 485 U.S. 681, 690-91 (1988),[24] the Supreme Court of the United States further described the appropriate role of the trial court in resolving preliminary questions relative to the proper authentication of evidence:

> In determining whether the Government has introduced sufficient evidence to meet Rule 104(b), **the trial court neither weighs credibility nor makes a finding that the Government has proved the conditional fact** by a preponderance of the evidence. The court simply examines **all the evidence in the case and decides whether the jury could reasonably find** the conditional

---

[24] Noting the substantial similarity between Federal Rules of Evidence (FRE) 104(b) and 901(a) to KRE 104(b) and KRE 901(a), this Court has previously turned to federal decisions for guidance in interpreting our Kentucky rules. *Johnson*, 134 S.W.3d at 566.

fact . . . by a preponderance of the evidence. *See* 21 C. Wright & K. Graham, Federal Practice and Procedure § 5054, p. 269 (1977). The trial court has traditionally exercised the broadest sort of discretion in controlling the order of proof at trial, and we see nothing in the Rules of Evidence that would change this practice. Often the trial court may decide to allow the proponent to introduce evidence concerning a similar act, and at a later point in the trial assess whether sufficient evidence has been offered to permit the jury to make the requisite finding. If the proponent has failed to meet this minimal standard of proof, the trial court must instruct the jury to disregard the evidence.

We emphasize that in assessing the sufficiency of the evidence under Rule 104(b), the trial court must consider **all evidence presented to the jury**. "[I]ndividual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it. The sum of an evidentiary presentation may well be greater than its constituent parts." *Bourjaily*, [483 U.S. at 179–180].

(Emphasis added). Thus, "[b]ecause it is the jury that must decide the conditional fact, the judge must conclude that there is enough *admissible* evidence for a reasonable juror to find the fact." Stephen A. Saltzberg, *et al.*, 1 *Fed. Rules of Evid. Man. R.* § 104.02[4] (2019). In other words, the trial court's discretion to dispense with the rules of evidence

only applies to those preliminary fact determinations made by the judge under 104(a); *only admissible evidence can be used when the judge is deciding to submit the evidence to the jury under Rule 104(b)."*

*Kenneth W. Graham, Jr. & Daniel D. Blinka*, 21A *Fed. Prac. & Proc. Evid. (Wright & Miller)* § 5055 (2d ed. 2025) (emphasis added).

Based upon the foregoing authority, I am convinced the inadmissible Certification should not have been considered by the trial court for the purpose of authentication. However, I would further conclude the Commonwealth

54

presented other sufficient evidence to properly authenticate the cellphone data. Thus, any error in this regard may be deemed harmless. *See Lampkins v. Commonwealth*, 701 S.W.3d 99, 122 (Ky. 2024).

KRE 901(b) provides several illustrative, non-exhaustive "examples of authentication or identification conforming with the requirements of this rule[.]" Pertinent to the present appeal, KRE 901(b)(4) specifically authorizes proof of authentication by "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances." We have held "[t]his rule is 'flexible and far-reaching' in allowing circumstantial evidence" to support authentication. *Sanders*, 301 S.W.3d at 501 (quoting Robert G. Lawson, *The Kentucky Evidence Law Handbook* § 7.05(5) (4th ed. 2003)). Additionally, legal commentators have noted the frequent use of circumstantial evidence to authenticate electronic data. Edward J. Carter & K. Drew Moore, *Electronic Evidence: Cell Phone Forensics*, 71 DOJ J. Fed. L. & Prac. 25, 37 (2023).

Here, Tpr. Gabhart and Det. Friend testified at length concerning the identification and proper handling of the cellphone data in accordance with standard operating procedures. Additionally, both officers possessed extensive experience with the use of Cellebrite technology for data extraction. Moreover, as noted by the majority, the extracted data itself contained authenticating information.

Further, "[i]t is unnecessary to establish a perfect chain of custody or to eliminate all possibility of tampering or misidentification, so long as there is

55

persuasive evidence that 'the reasonable probability is that the evidence has not been altered in any material respect.'" *Rabovsky v. Commonwealth*, 973 S.W.2d 6, 8 (Ky. 1998) (quoting *United States v. Cardenas*, 864 F.2d 1528, 1532 (10th Cir. 1989)). Thus, any lack of first-hand knowledge or other perceived deficiencies relative to the testimony of Trp. Gabhart and Det. Friend implicated the weight, rather than the admissibility, of the disputed evidence. Based on the totality of the circumstantial proof and all the fair and permissible inferences which could be drawn therefrom, I am convinced a reasonable jury could find the extracted cellphone data was properly authenticated without regard to the inadmissible Certification. Therefore, I respectfully concur in result only.

Thompson, J., joins.


COUNSEL FOR APPELLANT:

Kayla Danielle Deatherage
Assistant Public Advocate


COUNSEL FOR APPELLEE:

Russell M. Coleman
Attorney General of Kentucky

Stephanie Lynne McKeehan
Assistant Attorney General